# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

UNITED STATES OF AMERICA and )
GOVERNMENT OF THE VIRGIN )
ISLANDS, )
           )
           Plaintiffs, )      CRIM. NO. 2004/0105
v. )
           )
REINALDO BERRIOS, TROY MOORE, )
ANGEL RODRIGUEZ, and FELIX CRUZ, )
           )
           Defendants. )
_____ )

## MEMORANDUM OPINION

Finch, J.

       After being found guilty by a jury on all charges, Defendants move for judgment of

acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.  In the alternative,

they seek a new trial.  See Fed. R. Crim. P. 33.  For the reasons stated in Part I, the Court grants

the motions for judgment of acquittal on Counts 3 and 4 as to Defendants Troy Moore, Angel

Rodriguez and Felix Cruz and otherwise denies the motion for judgment of acquittal.  The Court

denies the motions for a new trial as discussed in Parts II-IV.


**I.**      **Motion for Judgment of Acquittal**

       Review of the sufficiency of the evidence supporting a conviction is "highly deferential."

United States v. Hart, 273 F.3d 363, 371 (3d Cir. 2001) (citation omitted).  The Court "must

determine whether the evidence submitted at trial, when viewed in the light most favorable to the

government, would allow a rational trier of fact to convict."  Hart, 273 F.3d at 371 (quotation

omitted).  "The verdict of a jury must be sustained if there is substantial evidence, taking the

view most favorable to the Government, to support it."  United States v. Iafelice, 978 F.2d 92, 94

(3d Cir. 1992) (quotation omitted). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt," may the Court overturn the jury's verdict. United States v. McNeill, 887 F.2d 448, 450 (3d Cir. 1990) (quotation omitted). Thus, a claim of insufficiency of the evidence places "a very heavy burden" on a defendant. United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990).

"To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilty." Id. (quotation omitted). "There is no requirement . . . that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation." Iafelice, 978 F.2d at 97. All issues of credibility are within the province of the jury. Gonzalez, 918 F.2d at 1132. "It is not [the Court's] role to weigh the evidence to determine the credibility of witnesses." United States v. Cothran, 286 F.3d 173, 175 (3d Cir. 2002).

The Court views the totality of the circumstances when examining the sufficiency of the evidence. United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984). "The prosecution may fulfill its burden of proving the elements of a crime through circumstantial evidence." Paez v. O'Lone 772 F.2d 1158, 1160 (3d Cir. 1985); see Jackson v. Virginia, 443 U.S. 307, 324-25 (1979) (finding that necessary intent was proven beyond a reasonable doubt through circumstantial evidence); see also United States v. Wexler, 838 F.2d 88, 90 (3d Cir. 1988) (stating that conspiracy can be proven through circumstantial evidence); Leon, 739 F.2d at 891 (finding that record had sufficient circumstantial evidence for jury to find defendant guilty of aiding and abetting substantive crimes charged). "It is not unusual that the government will not have direct evidence. Knowledge is often proven by circumstances. A case can be built against the

2

defendant grain-by-grain until the scale finally tips; and considering all the facts and drawing upon rational inferences therefrom, a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime for which he is charged."  Iafelice, 978 F.2d at 98. "Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred.  The fact that evidence is circumstantial does not make it less probative than direct evidence."  McNeill, 887 F.2d at 450 (citation omitted).

"The prosecution must prove every element of a crime charged beyond a reasonable doubt. . . ."  Government of the Virgin Islands v. Smith, 949 F.2d 677, 682 (3d Cir. 1991). "[D]iminishing this burden violates a defendant's right to due process."  Id.  On a post-trial motion for acquittal based on the insufficiency of the evidence, the Court must determine whether there is substantial evidence, direct or circumstantial, with logical inferences drawn in the light most favorable to the government, from which a reasonably jury could have found beyond a reasonable doubt that the government proved all the elements of the offense.  See United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991).

A.      The Crime Spree

On the evening of April 17, 2004, at about 9:45 P.M., Lydia Nicholls Caines was near the Aureo Diaz housing complex in St. Croix, Virgin Islands speaking on her cell phone when a masked man exited from a white Suzuki Sidekick with tinted windows and stuck a gun against the window of her car, a tan Chevy Cavalier.  She dropped her cell phone in the car and relinquished her car. Both her car and the white Suzuki Sidekick were driven away.

3

About an hour later that same evening, three masked gunmen entered and attempted to rob the Wendy's Restaurant. They shot Police Officer Cuthbert Chapman who was working, while off-duty, as a security officer for Wendy's Restaurant. Officer Chapman died nine days later from complications related to the bullet wounds.

After the shooting, a Wendy's employee, Itisha Browne, saw two of the masked men get into, what she described as a champagne-colored Chevy Cavalier. The man who was driving the Chevy Cavalier was not one of the three masked men who had entered Wendy's

The Chevy Cavalier crashed, ruining one of the tires, and the occupants abandoned it. When the Chevy Cavalier was recovered, the police determined that it was the same Chevy Cavalier that had been stolen from Caines. However, the license plate had been switched and its side-view mirror was missing. A mask was found close to the Chevy Cavalier.

At around 11:00 P.M., shortly after the Wendy's attempted robbery and shooting, Shariska Petersen was in front of her house about to get into her car, a Honda Accord. She was accosted by three masked men in dark clothing who demanded the keys to her car. One of the men pointed a black gun at her head. Rather than giving them the keys, she threw them into high grass in her yard. After one of the men warned, "You should not have done that," the three men ran down the street. A fourth man joined them as they were running.

Minutes later, Rita Division, who was locking up the gate at Central High School where she worked, was surprised to see that a masked man was driving her car, a Toyota Echo, which she had left running. Another man ordered her at gunpoint to stay away from her car. She saw a total of four men get into her car.

A few days later, Division's car was recovered where it had been concealed in a bushy

area behind the Friedensberg project, also known as Candida Guadalupe.  The original license plate for Caines' Chevrolet Cavalier and the missing side-view mirror were in the vicinity.

B.      The Jury's Verdict

A grand jury indicted Berrios, Moore, Rodriguez and Cruz of carjacking Caines' Chevy Cavalier, (Count 3)  brandishing a firearm in committing the carjacking of Caines' Cavalier, (Count 4), a conspiracy to interfere with business at Wendy's Restaurant by robbing it, (Count 1) attempting to interfere with business at Wendy's Restaurant by robbing it, (Count 2),  first degree felony murder of Officer Cuthbert Chapman, (Count 5),  killing Officer Chapman with a firearm, (Count 6),  unauthorized possession of a firearm used to commit murder, (Count 7), attempting to carjack Shariska Petersen's Honda Accord, (Count 8), brandishing a firearm in attempting to carjack Petersen's Accord, (Count 9), carjacking Rita Division's Toyota Echo (Count 10), and brandishing a firearm in carjacking Division's Echo (Count 11).  In all counts, except the conspiracy count, each Defendant was charged as both a principal and an aider and abettor. The jury found Defendants guilty on all counts.  Defendants contend that the evidence was insufficient for the jury to have found, beyond a reasonable doubt, that they were the culprits.

C.      Evidence Linking Defendants to the Crimes Charged

1.      *Caines' Carjacking at Gunpoint*

When Caines got out of her car, she saw a white Suzuki Sidekick with tinted windows behind her car.  Caines later  identified the vehicle.  The car she identified belonged to Berrios and had been driven by Berrios earlier in the evening when he got a traffic ticket, and later in the evening when he spoke to a police officer after parking at the Freidensberg housing project.  In

addition, the jury heard Berrios discussing, on a prison yard recording, his involvement as one of

the gunmen at Wendy's. The jury also learned that gunmen sped away in a Chevy Cavalier that

matched the description of the Chevy Cavalier that had been carjacked. Shortly after the Wendy's

incident, Caines' Chevy Cavalier was found abandoned with a switched license plate.

This evidence is sufficient to link Berrios to the carjacking of Caines' Chevy Cavalier and

the brandishing of the firearm in committing the carjacking. Caines' identification of the white

Suzuki Sidekick as the particular white Suzuki Sidekick that was involved in the carjacking was

bolstered by the connection between Berrios' role in the Wendy's attempted robbery and

shooting and the use of her car as the getaway vehicle. Because it was Berrios' Suzuki Sidekick

and he was known to have been driving it earlier in the evening, a reasonable juror could infer

that Berrios was either driving the white Suzuki Sidekick, which would make him an aider and

abettor, or that he allowed someone else to drive his vehicle while he threatened Caines and stole

her vehicle. Thus, there was sufficient evidence for the jury to find Berrios guilty of the Caines'

carjacking at gunpoint.

Although at least one other person must have been involved, since the Chevy Cavalier

and white Suzuki Sidekick were both driven away from the scene, there is insufficient evidence

from which a reasonable juror could find beyond a reasonable doubt that Moore, Cruz, or

Rodriguez committed or aided and abetted in the Caines' carjacking. No doubt there is physical

and circumstantial evidence connecting Moore, Cruz, and Rodriguez with the Chevy Cavalier.

However, that evidence only connects these Defendants with occupying the Chevy Cavalier, or

switching license plates on the Chevy Cavalier, at some point after the carjacking. It proves

little, however, with regard to whether any of these individuals conducted the Caines' carjacking.

6

From the facts that the side-view mirror was severed from the Chevy Cavalier and the side-view mirror and the Cavalier's license plate were found in the bushy area behind the Freidensberg housing project, a reasonable jury could infer that the Chevy Cavalier was not driven directly from the site of the carjacking to the Wendy's Restaurant.  In fact, the Government's theory is that the Chevy Cavalier was not driven from the carjacking directly to Wendy's.

Moore's twin sister, Tyiasha Moore, saw Moore, Cruz and Rodriguez at the Freidensberg housing project after the carjacking, but before the Wendy's attempted robbery.  To the extent that the evidence shows that Moore, Cruz, and Rodriguez traveled to or left Wendy's in the Chevy Cavalier, it is too deficient to support the inference that any or all of them stole Caines' car from her at gunpoint.

It would be pure speculation for the jury to conclude that more than one other person was present in the white Suzuki Sidekick at the time of the carjacking.   There is insufficient evidence for the jury to determine the identity of any other person involved in the Caines' carjacking, beside Berrios,  beyond a reasonable doubt.   Thus, the Court finds that there was insufficient evidence to link Moore, Cruz or Rodriguez with the carjacking of Caines' Cavalier.  Therefore, the Court acquits Moore, Cruz and Rodriguez of Counts 3 and 4.

2.     *The Wendy's Attempted Robbery and Murder of Officer Chapman*

The prison yard conversation between Moore and Berrios that was surreptitiously recorded, in and of itself, was evidence sufficient for the jury to find them guilty beyond a reasonable doubt of the counts related to the Wendy's attempted robbery and murder of Officer

Chapman.  Berrios boasts about jumping over the counter at Wendy's, demanding to see the manager, and shooting Chapman.  Moore also brags about shooting Chapman.  However, that is not the only evidence against  Berrios and Moore.

Shortly before the crime spree, Berrios divulged to a friend, Basdeo Mohan, that he was planning to rob K-Mart.  Mohan warned Berrios that since K-Mart had been recently robbed, it had tightened its security.  As a result, Berrios altered his plans.  Berrios told Mohan that he was going to rob Wendy's instead.  The day after the Wendy's robbery and shooting, Berrios told Mohan that he had gone on "the run," but that it had "turned bloody."  Mohan interpreted this as meaning that Berrios had attempted to rob Wendy's, but that somebody had been shot.

A Wendy's customer who was present during the attempted robbery and shooting heard one of the gunmen address another gunman who met Moore's general physical description as to complexion, height, and weight.  He called Moore by his first name, saying "Troy, let we go," which means "Troy, let's go."

Moore and Berrios also talked about Rodriguez's role in the Wendy's incident when they met in the prison yard.  They called him by the nickname "Dungo."  They were displeased that "Dungo" had crashed the Chevy Cavalier.   Rodriguez never denied that he was involved in the Wendy's incident when he was questioned by his girlfriend, Cynthia Collins.  That Rodriguez's fingerprints were found on the license plate that was substituted on Caines' Chevy Cavalier places Rodriguez with the Chevy Cavalier before the Wendy's incident.  Rodriguez and Moore both made calls using Caines' cell phone after the Wendy's incident.  These facts tend to prove that Rodriguez was involved with the attempted robbery and shooting at Wendy's.

The jury could reasonably infer that the Wendy's attempted robbery was committed by

8

four individuals; the three who entered Wendy's and one who waited outside in the Chevy

Cavalier.  Although Wendy's employee, Browne, only saw two men get into the Chevy Cavalier,

a jury could reason that since there had been three masked men inside Wendy's and a fourth man

waiting in the Chevy Cavalier,  all three masked men in addition to the driver escaped in the

Chevy Cavalier.  Moreover, after the Chevy Cavalier crashed, Petersen, the victim of the botched

carjacking, and Division, the victim of the successful cajarcking, both saw four men.

The jury found that the fourth man was Cruz.  Threads found in the Chevy Cavalier were

consistent with the material of a dark blue jacket retrieved from the room of Cruz's house where

he kept his pants.  Cruz was seen, by two witnesses, Angel Ayala and Tyiasha Moore, wearing

such a dark-colored jacket by two witnesses on the day of the crime spree.  Ayala stated that Cruz

and Rodriguez were wearing black and blue sweaters with hoods when they approached him

concerning safekeeping a .45 caliber gun for them.  Tyiasha Moore also saw Cruz wearing dark

clothing shortly before the Wendy's incident.

When Tyiasha Moore saw Cruz, he was at the Freidensberg project in the company of

Berrios and Rodriguez, who were also wearing dark clothing.  Cruz, Berrios, and Rodriguez were

just downstairs from Troy Moore's residence.  Troy Moore was at home when Tyiasha Moore

saw Cruz, Berrios and Rodriguez.  The Wendy's attempted robbery and shooting occurred within

an hour after Tyiasha Moore saw these three men in the vicinity of her brother's residence.

The Court finds, without pause, that the evidence was sufficient for the jury to find

Moore, Berrios and Rodriguez guilty of the Wendy's attempted robbery and murder of Officer

Chapman.  Although the evidence is not as overwhelming with respect to Cruz, based on his

association with the other perpetrators just before the Wendy's attempted robbery and shooting,

9

his clothing matching a thread found in the getaway vehicle, and witnesses seeing him wearing such clothing on the day of the Wendy's incident, a reasonable jury could find, beyond a reasonable doubt, that Cruz was one of the masked gunmen at Wendy's.

### 3. *Petersen's Attempted Carjacking at Gunpoint*

After finding sufficient evidence to conclude that the four people who attempted to rob Wendy's were Moore, Berrios, Rodriguez and Cruz, the inference that these same four men attempted to carjack Petersen is readily formed. The getaway vehicle, the Chevy Cavalier, crashed and the occupants abandoned it to find another means of continuing their escape. Three of the four men were still wearing masks when they approached Petersen. That a mask was found near the Chevy Cavalier further demonstrates that the men who rushed from Wendy's in the Chevy Cavalier were the same four men who attempted to carjack Petersen. Finally, Mohan testified that Berrios told him that after the Chevy Cavalier crashed, they approached a woman who threw her keys away from them. The jury had sufficient evidence from which to find all four Defendants guilty of attempting to carjack Petersen. That one of the gunmen pointed a gun at Petersen's head is sufficient for the jury to have found that Defendants had the intent to cause death or serious bodily harm and that they attempted to take the vehicle by force, violence, and intimidation.

### 4. *Division's Carjacking at Gunpoint*

Immediately after the attempted robbery of Petersen's Honda Accord, Division's Toyota Echo was taken from her at gunpoint. Three of the four men Division saw wore masks. The Toyota Echo was recovered from the same spot in which the plates of the Chevy Cavalier were

found within easy walking distance of the Freidensberg project.

The Government's hypothesis that the same men who attempted to rob Wendy's and killed Officer Chapman attempted to carjack Petersen's Honda Accord and then commandeered Division's Toyota Echo is sound given the evidence.   The evidence was sufficient for the jury to find, beyond a reasonable doubt, that Moore, Berrios, Rodriguez and Cruz carjacked Division at gunpoint.

## II.   MOTIONS FOR A NEW TRIAL BASED ON ERRONEOUS ADMISSION OR EXCLUSION OF EVIDENCE

When admission of evidence violates a defendant's constitutional rights, the error must be harmless beyond a reasonable doubt.  United States v. Cross, 308 F.3d 308, 326 (3d Cir. 2002).  Unless it is an error of constitutional magnitude, however, "the improper admission of evidence does not require reversing a conviction if it is highly probable that the error did not contribute to the judgment."  Id. (quotation omitted). "'High probability' requires that the court possess a sure conviction that the error did not prejudice the defendant."  United States v. Jannotti, 729 F.2d 213, 220 n.2 (3d Cir. 1984).  But the Government does not "need to disprove every reasonable possibility of prejudice."  Cross, 308 F.3d at 326 (quotation omitted).  Moreover, the Court can affirm not just on the grounds argued by the Government, but for any reason supported by the record.  Id.

A.   Errors Assigned to Admission of the Prison Yard Recording

1.   *The Attorney Who Applied for the Title III Wiretap was Not Admitted in Puerto Rico*

The Trial Attorney for the United States Department of Justice who applied for the Title

III wiretap, pursuant to which the prison yard conversation between Moore and Berrios was intercepted, was not admitted to practice before the United States District Court of Puerto Rico as required by Rule 83.1 of the Local Rules of the District of Puerto Rico.  Notwithstanding this noncompliance with Rule 83.1, United States District Judge Daniel Dominguez of the District of Puerto Rico granted such application.  The surreptitiously recorded conversation between Moore and Berrios that was admitted at trial in this matter was intercepted during the course of this Title III wiretap.

Berrios posits that, because the Trial Attorney was not admitted to practice before the United States District Court of Puerto Rico, Judge Dominguez did not properly grant the application which rendered the intercepted dialogue inadmissible.

A district court has discretion to depart from its own procedural rules.  United States v. Rivas, 493 F.3d 131, 141 (3d Cir. 2007).  "The district court's inherent discretion to depart from the letter of the Local Rules extends to every Local Rule regardless of whether a particular Local Rule specifically grants the judge the power to deviate from the Rule."  Somlyo v. J. Lu-Rob Enterprises, Inc., 932 F.2d 1043, 1048-49 (2d Cir. 1991).  However, "[t]o set the strictures of a local rule to one side without advance notice, the court (1) must have a sound reason for doing so, and (2) must ensure that no party's substantive rights are unfairly jeopardized."  United States v. Diaz-Villafane, 874 F.2d 43, 45-46 (1st Cir. 1989).

Since a wiretap application is *ex parte*, the question of advance notice is not a consideration.  No substantive right of Defendants was jeopardized by the Trial Attorney's failure to gain admission to the United States District Court of Puerto Rico.  The Trial Attorney, as an attorney for the Government, was authorized to apply for a wiretap order.  18 U.S.C. §

12

2516(3); Fed. R. Crim P. 1(b)(1)(D); 28 C.F.R.§ 77.2(a).   The Trial Attorney, in his request for

a wiretap, asked that "the order require its execution as soon as practicable after it is signed."

Although Judge Dominguez has not had occasion to enunciate his reasons for not requiring the

Trial Attorney to be admitted, exigency may have supported that decision.  Nothing that has been

presented to the Court would support a conclusion that Judge Dominguez did not have a sound

reason for allowing the Trial Attorney to proceed with the application without requiring him to

adhere to Rule 83.1.

Because there are no grounds upon which this Court can find that Judge Dominguez

abused his discretion by not requiring that the Trial Attorney be admitted before granting his

application, the Court cannot find error in granting the application.  The deviation from the

strictures of Rule 83.1 does not warrant the exclusion of the intercepted prison yard  conversation

between Moore and Berrios.

### 2.   *Audio Video Recording with Incorporated Transcript*

Defendants contend that playing the video and audio recording of Moore and Berrios

conversing in the prison yard simultaneously with a transcript of the audio portion scrolled at the

bottom of the viewing screen encouraged the jurors to consider the transcript as evidence.

According to Defendants, the harm was exacerbated by the partial inaudibility and lack of clarity

of the audio portion.

It is well established that a Court may permit the use of transcripts to assist the jury while

listening to recordings, as long as the jury is warned that the recording controls over the

transcript in case of any differences between the recording and the transcript.  See United States

v. DiSalvo, 34 F.3d 1204, 1220 (3d Cir. 1994);  United States v. Adams, 759 F.2d 1099, 1115 (3d Cir. 1985).   Defendants do not challenge the use of a transcript, but rather the manner in which the Government presented it.

_____Without doubt, a transcript scrolled across the bottom of an audio-video recording is of greater assistance to a juror than a transcript in paper form.   The juror can simultaneously view the video, listen to the audio and read the written words when the transcript is projected on the movie screen along with the video.   That the jurors were assisted in understanding the highly incriminating conversation between Moore and Berrios through the use of the scrolling transcript as well as a written transcript was more prejudicial than if the Government had provided the jurors only with written transcripts.   Although it was more prejudicial, however, it was not unfairly prejudicial.

The Court previewed the recording to assess its audibility and the accuracy of the transcription.   The Court found that the recording was sufficiently comprehensible to be understood by the jury and that the speakers' words were adequately transcribed.  See United States v. Jackson, 649 F.2d 967, 977 (3d Cir. 1981) (noting that trial court has "considerable discretion regarding the admissibility of a tape recording where there is a serious question of its audibility").   As to the inaudible and unintelligible portions, the jury could not fall into the trap of considering the transcript in lieu of the recording because such portions were not transcribed.

The Court cannot find that the jurors gave the transcript any evidentiary value. The Court cautioned the jury more than once not to consider the transcript as evidence. The transcript was not admitted into evidence and the jury was not given access to a transcript of this recording in any form for deliberation.   Because the use of the transcript assisted the jury without being

14

unfairly prejudicial, the Court did not err in allowing the inclusion of the scrolling transcript below the projected recording of the prison conversation between Moore and Berrios.

          3.     *Crawford and  Bruton*

      The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. Amend. VI.  The Supreme Court in <u>Crawford v. Washington</u>, 541 U.S. 36, 68 (2004) held that an out-of-court testimonial statement, offered against a defendant, is admissible only if the defendant had a prior opportunity to cross-examine the declarant, who has since become unavailable.  Rodriguez and Cruz maintain that the statements of Moore and Berrios recorded in the prison yard should not have been admitted against them because they had no opportunity to cross-examine Moore or Berrios.

      The flaw in Defendants' argument is that when Moore and Berrios were conversing with one another in the prison yard, their statements were not testimonial in nature.  "[T]he surreptitiously monitored conversations and statements contained in the Title III recordings are not 'testimonial' for purposes of *Crawford*."  <u>United States v. Hendricks</u>, 395 F.3d 173, 181 (3d Cir. 2005).  Thus, the right to confrontation does not arise.

      As a general rule, in a joint trial, the confession of one non-testifying defendant may not be used as evidence against a co-defendant.  <u>Bruton v. United States</u>, 391 U.S. 123 (1968). <u>Bruton</u> applies not only to testimonial statements, but also to nontestimonial statements such as statements of the non-testifying co-defendant to family or friends.  <u>United States v. Mussare</u>, 405 F.3d 161, 168 (3d Cir. 2005); <u>see also</u> <u>McCulloch v. Horel</u>, 2008 WL 755919, at *13 (C.D. Cal.

Jan. 31, 2008) (declining to construe <u>Crawford</u> and <u>Whorton v. Bockting</u>, 127 S. Ct. 1173, 1183

(2007) as narrowing the scope of <u>Bruton</u> to only testimonial statements).  <u>But</u> <u>United States v.</u>

<u>Pugh</u>, 2008 WL 961564, at *3-4 (6th Cir. Apr. 9, 2008) (holding <u>Bruton</u> inapplicable to

nontestimonial statements).

      However, even when the nontestimonial statement of a non-testifying co-defendant

incriminates the defendant, it is admissible under <u>Bruton</u> "if it falls within a firmly rooted hearsay

exception or is supported by a showing of particularized guarantees of trustworthiness."

<u>Mussare</u>, 405 F.3d at 168.   The catch-all exception to the hearsay rule, Federal Rules of

Evidence 807 "permits admission of hearsay if (i) it is particularly trustworthy; (ii) it bears on a

material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is

consistent with the rules of evidence and advances the interests of justice; and (v) its proffer

follows adequate notice to the adverse party."  <u>United States v. Bryce</u>, 208 F.3d 346, 350 (2d Cir.

1999).

      The conversation on the Moore-Berrios recording has a high degree of trustworthiness.

"[I]f the statement is made to a person whom the declarant believes is an ally rather than a law

enforcement official, and if the circumstances surrounding the portion of the statement that

inculpates the defendant provide no reason to suspect that that inculpatory portion is any less

trustworthy than the part of the statement that directly incriminates the declarant, the

trustworthiness of the portion that inculpates the defendant may well be sufficiently established

that its admission does not violate the Confrontation Clause."  <u>Bryce</u>, 208 F.3d at 351 (quotation

omitted).

      In <u>Bryce</u>, as in this case, the statements were obtained via a covert wiretap.  <u>Id.</u>  The

statements implicated both speakers and the defendant challenging the introduction of the conversation.  Id.  There was no reason to believe that the speakers had any motive to lie, or were lying, during the discussion.  Id.

The conversation between Moore and Berrios was highly incriminating against them. Neither Moore nor Berrios was attempting to deflect criminal liability or to inculpate Cruz or Rodriguez.  If Moore or Berrios knew that they were being overheard, neither would have engaged in such a discussion.  Thus, the statements possessed a particularized guarantee of trustworthiness.  Therefore, the Court's decision to admit the prison yard recording of thee conversation between Moore and Berrios against Rodriguez and Cruz was proper under Rule 807 and the Confrontation Clause.

B.      Exclusion of Audio Recording Proffered by Defendant Felix Cruz

Armando Cruz recorded a conversation he had with Felix Cruz at the Government's request.  The conversation was generally in a variation of English common to St. Croix, referred to as "raw Crucian" with some words spoken in Spanish.  During the course of the dialogue, Armando Cruz indicated that he was unemployed.  When Armando Cruz asked Felix Cruz about the Wendy's incident, Felix Cruz was recorded as denying his involvement.

When called to the stand, Armando Cruz testified that he earned about $700 per week as a fisherman.  Vol. XIII, 69:14-25.  None of the Defendants cross-examined Armando Cruz on this point.

Felix Cruz sought to introduce the recorded conversation in his case-in-chief.  He argued that the evidence that Armando Cruz was unemployed, unlike his testimony that he was earning

17

$700 weekly, would show that he was financially motivated to work with the investigators. Thus, Felix Cruz's primary reason for seeking admission of the recording was to show that Armando Cruz was biased.

Felix Cruz also wanted the jury to hear him tell Armando Cruz that he had not been involved in the Wendy's incident. The friendly tone of the exchange would demonstrate to the jury, according, to Felix Cruz, that he was being truthful when he insisted that he was not one of the perpetrators.

The Court properly denied admission of this recording for a number of reasons. First, extrinsic evidence of a prior inconsistent statement of a witness is only admissible if the "witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Fed. R. Evid. 613(b). Felix Cruz realized that Armando Cruz could not be readily recalled since Armando Cruz testified that was living somewhere other than St. Croix. Vol. XIII, 64:17-25. Notwithstanding, Felix Cruz never requested that Armando Cruz remain on St. Croix until the conclusion of the trial. When Felix Cruz attempted to introduce the recording, Armando Cruz was no longer available and would not be afforded an opportunity to explain or deny his recorded statement that he was unemployed. Therefore, the recording was inadmissible under Rule 613(b) of the Federal Rules of Evidence.

Second, Felix Cruz's denial of his involvement at Wendy's is hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). As the Government pointed out, Felix Cruz's statement is not admissible under Rule 801(d)(2) as an admission by a

18

party-opponent.  Felix Cruz did not express any evidentiary basis upon which the Court could

have admitted his exculpatory statements as part of  his case-in-chief.  Moreover, since Armando

Cruz acknowledged that Felix Cruz had denied being involved "in such ridiculous activities"

during the recorded conversation, Vol. XIII, 68:25 – 29:2, the recording would not have been

admissible to impeach Armando Cruz.

Third is the issue of authentication which is required for admission under Federal Rules

of Evidence 901.  Although the Government conceded that it could authenticate the voice of

Armando Cruz on the recording, Felix Cruz did not indicate that he had a witness who could

authenticate his voice.

Finally, Felix Cruz did not provide a translation of the Spanish portions of the recording.

Although some jurors on this panel may have understood the Spanish portions, others may have

been perplexed.  Thus, each juror would not be exposed to the same evidence at trial.  To the

extent the Spanish portions were material, this could undermine Felix Cruz's Sixth Amendment

right to a trial by an impartial jury.  Absent an English translation of the Spanish portions, the

Court could not properly rule on their materiality.

For all of these reasons, the Court finds that its decision to exclude the Armando Cruz-

Felix Cruz recording was not erroneous and does not warrant a new trial

C.     Error in Admitting Evidence of Berrios' Possession of Ammunition and Berrios'
       Explanation

During a search of Berrios' father's home, law enforcement discovered ammunition of

various gauges which had been concealed in a stereo speaker in a room frequented by Berrios and

his brothers, and accessible to Berrios' father.  None of the ammunition was similar to the

19

ammunition found at Wendy's or recovered from the victim's body.  When Berrios was questioned regarding the Wendy's incident, he was asked about the ammunition.  He admitted that the ammunition was his and explained that neighborhood youths had collected it for him.

Berrios seeks a new trial on the grounds that the evidence of his possession of ammunition and his allegedly false explanation to law enforcement concerning the manner in which he obtained the ammunition constitutes evidence that is inadmissible as prior bad act evidence under Rule 404(b) of the Federal Rules of Evidence.  The Government responds that it intended to use the ammunition only to set a foundation for introducing Berrios' purportedly false exculpatory statement concerning the source of the ammunition to show Berrios' consciousness of guilt.

Evidence may be admitted to show consciousness of guilt without offending Rule 404. United States v. Kemp, 500 F.3d 257, 298 & n.23 (3d Cir. 2007).  A defendant's false explanation of conduct which is the subject of criminal charges against him is admissible as tending to show consciousness of guilt.  See Wilson v. United States, 162 U.S. 613, 620-621 (1896).  However, the corollary also holds true: A defendant's false explanation of conduct which is **_not_** the subject of criminal charges against him is **_not_** admissible as tending to show consciousness of guilt.

The Government offered no rationale for admitting the ammunition or Berrios' statements about the ammunition other than to show consciousness of guilt.  Because the ammunition had no connection to the Wendy's incident, Berrios' explanation about the source of the ammunition could have been neither exculpatory nor falsely exculpatory.  Thus, the Court erred in admitting such evidence.

The error in admitting the ammunition, however, was not prejudicial.  The Government made no attempt to link the ammunition itself with the crimes with which Berrios was charged. See Louisiana  v. Villavicencio,  528 So.2d 215, 216-217 (La. Ct. App. 1988) (finding nonreversible error in admitting weapon not involved in shooting because prosecutors did not attempt to link weapon to shooting).  In fact, the jury learned that no similar ammunition was found at Wendy's.  Thus, there was little possibility, absent proof of some connection, that Berrios' possession of ammunition would have caused the jury to prejudicially associate Berrios with the Wendy's shooting.  See Louisiana v. Manieri, 378 So.2d 931, 933 (La. 1979) (holding that although trial judge erred in admitting knives, there was no prejudice since government witness testified that such knives were not the murder weapon).

The error in admitting Berrios' explanation of the source of the ammunition also did not harm Berrios.  Because the ammunition was not connected with the Wendy's incident, Berrios' allegedly false statement concerning the source of the ammunition did not tend to show any consciousness of guilt as to the Wendy's incident.  At most, the jury could infer that Berrios was lying to protect either the identity of the true owner of the ammunition or the person who had provided the ammunition.

Moreover, Berrios' alleged falsehood was cumulative to other false and contradictory statements that Berrios made during the same interrogation that bore directly on his consciousness of guilt concerning the Wendy's incident.  Berrios misstated the time that he received a traffic ticket.  He also related  that he had told a friend that he had been involved in the Wendy's incident, albeit jokingly, and then denied any such involvement.

This compelling evidence of Berrios' tendency to lie to exculpate himself minimized any

prejudice that Berrios may have suffered from the jury's improperly considering his comment about the source of the ammunition.  Even if the evidence prejudiced Berrios to some extent by distracting the jury or by arousing the jury's passions, "it is 'highly probable' that the superfluous evidence made no difference in the ultimate verdict of the jury."  United States v. Cross, 308 F.3d 308, 326 (3d Cir. 2002).  Therefore, the Court finds that the admission of the ammunition and the explanation concerning the source of the ammunition constitutes harmless error and does not warrant a new trial.

### III.    MOTION FOR NEW TRIAL BASED ON ERRORS ASSIGNED TO OPENING STATEMENT AND CLOSING ARGUMENT

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985).  "A mistrial is not required where improper remarks were harmless, considering their scope, their relation to the context of the trial, the ameliorative effect of any curative instructions and the strength of the evidence supporting the conviction."  United States v. Rivas,  493 F.3d 131, 140 (3d Cir. 2007).  "[I]mproper and prejudicial prosecutorial arguments generally are curable when the evidence is strong."  Moore v. Morton, 255 F.3d 95, 119 (3d Cir. 2001)

A harmless error analysis is applied in determining whether a new trial is warranted by improper remarks.  United States v. Gambone, 314 F.3d 163, 177 (3d Cir. 2003).  As with the consideration of whether a new trial is warranted by erroneous admission of evidence, when the error arising from improper remarks is of constitutional proportions, the error must be harmless

beyond a reasonable doubt.  Id.  If the error is non-constitutional, a new trial is not warranted

when there is a high probability that the error did not contribute to the conviction.  Id.   A new

trial is only warranted when "the prosecutors' comments so infect the trial with unfairness as to

make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168,

181 (1986) (quotation omitted).

A.      Officer Chapman's Photograph

During the course of the trial, an unremarkable snapshot of Officer Chapman wearing a

police shirt was introduced.  For emphasis, the Government gradually assembled this photograph

as if it were composed of pieces of a puzzle and displayed it on the movie screen so that it

covered the entire screen.

Because the photograph was properly admitted at trial, it was fair game in closing

argument.  See Browning v. Oklahoma, 134 P.3d 816, 839 (Okla. Crim. App. 2006)("Exhibits

properly admitted at trial may be used in closing argument.").  The wide latitude in argument

extends to visual aids, such as the enlarged projection of this photograph, particularly when, as in

this case, enlargements are used throughout trial.  See Browning, 134 P.3d at 839 (noting that

prosecution's use of large projections of color slides and photographs was upheld throughout the

trial, so that display of enlarged photographs of victim's remains during closing was within

court's discretion);  see also Tennessee  v. Kimbrough, 2005 WL 292419, at *20 (Tenn. Crim.

App. Jan. 31, 2005) (holding that display of photograph of live victim on large projector screen

during prosecutor's closing argument, if error, was harmless error).   The photograph showed

Officer Chapman as a person and was not likely to inflame the jury's passions. See Minnesota v.

Buggs, 581 N.W.2d 329, 342 (Minn. 1998) (affirming showing before and after death pictures

during closing as intending to depict victim as human being rather than inflame jury).  The Court

finds that the prosecutor's use of Officer Chapman's photograph, as it was displayed, in closing,

did not introduce reversible error.

      B.      Farewell Poem

      The prosecutor recited a poignant poem about Officer Chapman during his closing

argument:

> To Officer Chapman, I bid you farewell, a man and a hero I never knew well.
> Like those before him he answered the call, out gunned and out flanked, he was
> destined to fall.  But the job he chose never promised long life, just respect from
> others whom he protected from strife.  He went without fear into that night.
> Against crime and evil he fought the good fight.  On an April night he did all that
> he could.  He sacrificed his life to fight bad with good.  In the face of a gun he
> showed steely nerve, and he kept his promise to protect and to serve.

Vol. XVI, 142:21 – 143:5.

      A prosecutor may not make statements calculated to arouse the passions or prejudices of

the jury.  Viereck v. United States, 318 U.S. 236, 248 (1943).  "[A]ppeals to passion and

prejudice may so poison the minds of jurors even in a strong case that an accused may be

deprived of a fair trial."  United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 240 (1940).

Such appeals encourage the jury to convict any defendants brought to trial to avenge the victim,

rather than to reach a verdict based on an unbiased determination of the defendants' culpability.

      Although the poem incorporates some facts adduced at trial, it is not strictly based on the

evidence and its principal effect was to evoke the passion of the jury.  For example, the poem

states: "He sacrificed his life to fight bad with good."  "It is not relevant that the victim is a

'good' person and that the defendant is a 'bad' person, even assuming that these characterizations are accurate." Massachusetts v. Simpson, 750 N.E.2d 977, 992 (Mass. 2001) (finding such characterization improper in prosecutor's closing argument in prosecution for murder of off-duty police officer). The poem also inappropriately focused on the service that Officer Chapman, as a police officer, provided to the community. Illinois v. Wilson, 628 N.E.2d 472, 485 (Ill. Ct. App. 1993) (stating that prosecutor's comments which dwelt on services performed by victims as police officers were overreaching). By referring to Officer Chapman as a hero and a person respected by those he protected from strife, the poem unduly praised Officer Chapman's character. See Roy v. Oklahoma, 152 P.3d 217, 230 (Okla. Crim. App. 2006) (concluding that "prosecutor's description of the noble character of the victim could reasonably be expected to be unfairly prejudicial to the jury's task regarding" determining whether defendant was criminally responsible for victim's death).

"[W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). The recital of this poem in the prosecutor's closing argument was improper. The prosecutor is admonished for pushing the bounds of approved advocacy at the very end of a nearly error-free, lengthy and arduous trial.

In the context of this trial, the inclusion of the poem was not so harmful as to mandate a new trial. Here, the improper remarks were "minor aberrations in a prolonged trial" rather than "cumulative evidence of a proceeding dominated by passion and prejudice." Socony-Vacuum Oil Co., 310 U.S. at 240.

The impact of the Court's gallery packed with police officers probably spoke more about the victim and cried out more for a verdict based on passion and prejudice than the poem did.

25

As the Government points out, the poem was laced with demonstrated facts. Although the Court did not give a curative instruction after the recitation of the poem, none was requested. The Court did instruct the jury, generally, that the closing argument was not evidence. Moreover, the jurors requested certain evidence during the course of its deliberations, which shows that they were weighing the evidence in a rational fashion, rather than acting based on any passion inflamed by the prosecutor's remarks. United States v. Monaghan, 741 F.2d 1434, 1440-1444 (D.C. Cir. 1984) (considering it unlikely that jurors would have requested certain items of evidence during deliberations if the prosecutor's remarks had inflamed their passions and prejudices). Finally, strong evidence supported Defendants' convictions for Officer Chapman's murder.

      C.      Rodriguez's Prison Letters

      Rodriguez seeks a new trial because the prosecutor mentioned in his closing that an ex-girlfriend of his had received letters from him which he had written while in prison. The prosecutor argued:

> And Attorney King gave the impression on his cross-examination that she was a woman scorned, that she had some ax to grind. And I got back up on rebuttal, and asked her about that fact, been letters, and that had been written. Since Rodriguez had been in jail. He wrote to her, and in the flowery language that he used, and obviously, things ended on a much better note between them than Attorney King tried to elicit from her when she was on the stand.

Vol. XVI, 131:24-132:7.

> Rodriguez's former girlfriend testified as follows at trial without objection:

> MR. WALLACE:      You Honor, he, Mr. King brought out she did not like the Defendant, and that's why she was trying to get back at him. I think these letters belie that.

BY MR. WALLACE:
Q.      Let me ask you, did there come a time when Angel Rodriguez wrote to you from
        prison?
A.      Yes.
Q.      What was the tone of these letters that he sent you?
A.      Good letters.
        . . . .
A.      Let me ask you to read this part . . . .
Q.      (Reading:) "I just want to thank you for everything you ever done for me."

Vol. XIII, 190:7-15; 192:1-4.

A comparison of this testimony with the prosecutor's comments during his closing

argument indicates that the prosecutor did not go beyond the evidence introduced at trial when he

mentioned the letters Rodriguez wrote from prison.  Nor did the prosecutor attempt to prejudice

Rodriguez through his reference to Rodriguez being in jail.  He used the letters only to

rehabilitate the witness after Rodriguez tried to impeach her credibility by showing her animus

toward Rodriguez.  Thus, the Court finds that the prosecutor's comments concerning Rodriguez's

prison letters were proper and are not a basis for a new trial.

        D.      Rodriguez's Ankle Bracelets

        Rodriguez's ex-girlfriend  responded to the open-ended question, "What did Angel

Rodriguez tell you?" as follows:

A.      Saying they was trying to put him in the robbery at the Wendy's.  But he had on
        an ankle bracelet.  So he didn't have anything to worry about.

Vol. XIII, 175:15-19.

Upon Rodriguez's objection, the Court struck the reference to the ankle bracelet and

instructed the jury to disregard any reference to any ankle bracelets.  Vol XIII, 175:20-24.

        As part of its closing argument, the Government showed a slide with five bullet points.

27

The fourth point stated:

> When Rodriguez got off the phone, Collins asked him what was going on & Rodriguez told Collins that they were trying to put him in a robbery at the Wendy's but that he did not have anything to worry about because he had an ankle bracelet at the time.

Gov't's Omnibus Resp. to Defts' Supplemental Mot. for New Trial, Attach. 7.

_____When Rodriguez immediately moved for a mistrial, the prosecutor explained that the reference to the letters was inadvertent and suggested that the Court give a curative instruction. Vol. XVI, 144:23-145:4; 146:5-8.  Rodriguez conceded that the prosecutor's conduct was unintentional. Vol. XVI, 146:18-22.

The Court instructed the jury:

> During closing arguments, the attorney for the Government, Mr. Wallace, may have made remarks to Mr. Rodriguez' being confined in pretrial, and being confined with maybe an ankle bracelet, being confined maybe with ankle chains. You are instructed to disregard any and all such references.

Vol. XVII, 8:8-13.

_____The reference to the ankle bracelet implies that Rodriguez had been arrested in a prior criminal matter, which runs afoul of the prohibition against admitting prior bad acts.  Moreover, the Court specifically sustained an objection to this reference and struck such evidence from the record.  Therefore, the prosecutor's comment was undebatably  improper.

This is tempered, however, by Rodriguez's use of the ankle bracelet to exculpate himself. Although other evidence was produced to show Rodriguez's involvement in the commission of the charged crimes, there was no explicit evidence that Rodriguez was not being electronically monitored on April 17, 2004.  If the jury believed that Rodriguez was being truthful when he spoke to Collins about wearing an ankle bracelet, the jury could have viewed Rodriguez's

28

statement to Collins as exculpatory. Of course, if the jury felt that the evidence was strong with

regard to Rodriguez's involvement in the Wendy's incident and carjackings, it would have taken

Rodriguez's statement as falsely exculpatory and could also have improperly considered it as

showing Rodriguez as not being law-abiding.  Because, in the context of the trial, the ankle

bracelet comment had the potential of weighing either for or against Rodriguez's guilt, it is not as

highly prejudicial as a comment that is clearly damaging.

 The scope of the comment, in comparison to the lengthy trial and extensive closing

argument, was minuscule.  The prosecutor did not remark upon the ankle bracelet orally.  The

reference was buried in a wordy Powerpoint slide.  Moreover, when one of the prosecutors

noticed the mention of the ankle bracelet, the Government quickly moved to the next slide.

 When the Court issued its appropriate curative instruction, Rodriguez never complained

of its inadequacy.  The Court also explained before the closing arguments that the prosecutor's

arguments were not evidence and told the jury that its decision must be based only on the

evidence.

 The Court finds that the prosecutor's improper comment about the ankle bracelet did not

contribute to Rodriguez's conviction.  The evidence against Rodriguez was substantial.

Rodriguez's fingerprint was on the license plate found on the getaway vehicle.  Moore and

Berrios were overheard discussing Rodriguez's role as the driver of the getaway vehicle.

Rodriguez used Caines' cell phone, which she had left in her car when she was carjacked, to call

his friends and family.  Finally, Collins testified that Rodriguez never denied his involvement in

the Wendy's incident.

 In sum, the Court concludes that the single improper reference to Rodriguez's wearing an

ankle bracelet to be harmless after considering its scope, its relation to the context of the trial, the ameliorative effect of the curative instructions and the strength of the evidence supporting the conviction.   The trial was not so infected with unfairness as to make the resulting convictions a denial of due process.

      E.      Improper Reference to Defendant Felix Cruz in Opening Statement

Cruz complains in his Motion for New Trial with Points and Authority filed on February 9, 2007 that the Government improperly "stated in its opening remarks to the jury that defendant Moore had planned to kill the Mountain Market employee [defendant Cruz] who was evidently one of the four robbers."  The Government filed its Ominbus Response to Defendants' Motions for New Trial and Extensions of Time to File Post-Trial Motions on March 28, 2007.   At the time that such motion and response were filed, the parties did not have the benefit of the trial transcript which was not filed until June 13, 2007.

The Court has reviewed the Government's opening statement several times and has not found reference to such a remark.  Accordingly, the Court finds that this assignment of error is unfounded.

## IV.    MOTION FOR NEW TRIAL BASED ON ERRONEOUS JURY INSTRUCTION REGARDING CARJACKING

      Defendant Berrios contends that a new trial is warranted on the carjacking charges because the jury was not properly instructed as to the definition of "intent to cause serious bodily harm."  The jury was told: "Whether the Defendant 'intended to cause death or serious bodily harm' is to be judged objectively from the conduct of the Defendant as disclosed by the evidence,

and from what one in the position of the alleged victim might reasonably conclude." Vol. XVI,
39:21-25.   Berrios preserved his objection to the inclusion of the clause "from what one in the
position of the alleged victim might reasonably conclude." Vol. XV, 97:7-18.

The Court's instruction to the jury corresponds exactly with the Eleventh Circuit's
interpretation of "intent to cause death or serious bodily harm" as that term is used in 18 U.S.C. §
2119.  "The defendant's intent is to be judged objectively from the visible conduct of the actor
and what one in the position of the victim might reasonably conclude." United States v. Fulford,
267 F.3d 1241, 1244 (11th Cir. 2001) (quotation omitted).  The jury instruction the Court gave in
this matter is also supported by United States v. Applewhaite, 195 F.3d 679, 685 (3d. Cir. 1999)
in which the Third Circuit held that using a van to move the victim's "limp body" was "not
sufficient to establish the intent required under § 2119," since the victim could not perceive the
threat.  Thus, the victim's reasonable perception plays a role in determining the perpetrator's
intent.   Accordingly, the Court finds that the jury instruction on the "intent to cause death or
serious bodily harm" was sufficient and does not warrant a new trial.

## V.    CONCLUSION

After reviewing the sufficiency of the evidence, in the light most favorable to the
Government, the Court finds the evidence sufficient to support the jury's verdict, except as to
Counts 3 and 4 against Moore, Rodriguez and Cruz.  For the reasons stated, the Court acquits
Defendants Moore, Rodriguez and Cruz of Counts 3 and 4 and otherwise denies the motions for
judgment of acquittal.  The Court also finds, in the exercise of its own judgment, that the jury's
verdict is not contrary to the weight of the evidence, and that there is not a serious danger that an
innocent person has been convicted.  The Court has reviewed each assignment of error raised by

Defendants – errors in the admission and exclusion of evidence, errors arising in the

Government's opening statement and closing argument and errors in the jury instructions – and

finds no reversible error.

ENTER:

DATE:   July 8, 2008 _____/s/_____
RAYMOND L. FINCH
DISTRICT JUDGE